DANIEL *v.* CITIZENS AND SOUTHERN NATIONAL BANK OF ATLANTA *et al.*

No. 11353.   MAY 9, 1936.

386

*W. S. Mann, S. D. Hewlett, Hugh Howell, D. M. Parker, O. H. Dukes, B. D. Murphy,* and *G. L. Goode,* for plaintiff in error.

*Alston, Alston, Foster & Moise, J. A. Branch, Marion Smith,* and *R. B. Troutman,* contra.

GRAHAM, Judge. It is practically conceded that if Daniel is a de jure officer—that is, if the Governor had authority to suspend Hamilton as Treasurer and appoint Daniel in his stead pending the suspension, the bank would be fully protected in the payment of the funds on deposit to Daniel as State Treasurer. But it is insisted that Daniel is not a de jure officer; that the Governor had no authority to suspend Hamilton and appoint Daniel, it being contended that section 40-1301 of the Code should be construed as a limitation on the power of the Governor to suspend as stated in section 40-206; that the two sections should be construed in pari materia and to mean that the Governor could suspend only after trial before the council; that if the Governor did have such authority, his order of suspension was tantamount to a removal, which was invalid because ordered without notice or trial to Hamilton, and because the order makes no findings of fact sufficient to show that any of the causes specified by the statute existed.

An examination of the constitution and provisions of the Code in reference to the suspension of the State Treasurer, as well as of the authorities construing the same, demonstrates that these objections to the authority of the Governor to suspend the State Treasurer and the validity of his appointment to fill the vacancy during the suspension are not tenable. The constitution of 1868 was silent as to the authority of the Governor to suspend the Treasurer, and the Governor was without statutory authority to suspend him. By an act of February 25, 1876 (Ga. L. 1876, p. 127), the legislature authorized the Governor to call a council, to be

composed of the Attorney-General, Secretary of State, and Comp-troller-General, in circumstances named, and upon a finding of a majority of the council to suspend the Treasurer, and, in the event of suspension, to appoint some fit and proper person to discharge the duties of the office during the period of the suspension. Such provision of this act is now in the Code of 1933, as follows: "40-1301. (222) Suspension of Treasurer; appointment of person to discharge duties.—Upon representation made to the Governor by any person under oath, or where the Governor has received reliable information from any source, that the Treasurer is insane or mani-festly insolvent, or that he has absconded or concealed himself, or is guilty of conduct which is to the hazard of the public treasury, he shall call a council to be composed of the Attorney-General, Secretary of State, and Comptroller-General, and if they, or a majority of them, after an examination into the truth of such representation, shall find the same to be true, the Governor shall suspend the Treasurer from office until the next session of the Gen-eral Assembly and issue proclamation thereof, and he shall sub-mit to said body his action in the premises and the reasons there-for. In the event of a suspension of the Treasurer, the Governor shall appoint some fit and proper person to discharge the duties of said office during the period of such suspension, who shall take an oath and give bond and security upon like terms and in the same manner as provided for the Treasurer elected by the people."

It was also provided in the act of 1876 that there should be a State Treasurer elected by a joint vote of both houses of the General Assembly, and that he should hold his office for four years. While the act of 1876 was in force as to the election and suspension of the State Treasurer, the constitution of 1877 was ratified. This constitution provided for election by the people of the State Treasurer; and further provided, in article 5, section 1, paragraph 18 (§ 2-2618), as follows: "The General Assembly shall have authority to provide by law for the suspension of either of said officers [State Treasurer or Comptroller-General] from the discharge of the duties of his office, and also for the appointment of a suitable person to discharge the duties of the same." By an act of September 30, 1879 (Ga. L. 1878-9, p. 30), the General As-sembly, without repealing the act of 1876 in reference to suspension of the State Treasurer, put into effect this provision of the constitu-

tion, the caption of the act being as follows: "An act to carry into effect paragraph 18, section 1, article 5 of the constitution of 1877; to provide for the suspension of the Treasurer or Comptroller-General of the State, and also for the appointment of a suitable person to discharge the duties of the same." Section 1 of the act, authorizing the General Assembly to suspend the State Treasurer or Comptroller-General, is incorporated in the Code of 1933 as follows: "47-701. (347) Suspension of Comptroller-General or State Treasurer.—The General Assembly may suspend from the functions and duties of office either the State Treasurer or the Comptroller-General (by joint resolution duly adopted after being read one time in each House on different days, and by a two-thirds vote of members voting on the same), whenever the interests of the State, or the proper administration of the law demand such suspension." Section 2 of the act is incorporated as follows: "40-206 (160) Suspension of State Treasurer or Comptroller.—Whenever the Governor shall have trustworthy information that the State Treasurer or Comptroller-General is insane, or has absconded, or grossly neglects his duties, or is guilty of conduct plainly violative of his duties, or demeans himself in office to the hazard of the public funds or credit of the State, the Governor shall suspend said Treasurer or Comptroller-General, as the case may be, and report his reasons for such suspension to the General Assembly. Said suspension shall continue until the General Assembly shall otherwise direct." Section 3 of the act provides for appointment by the Governor of some suitable person to discharge the duties of the office, this provision being codified as follows: "40-207 (161) Officers pro tem. in cases of such suspension, appointment.—Whenever the State Treasurer or Comptroller-General shall be suspended, the Governor shall appoint some suitable person to discharge the duties of the office until the suspended official shall be restored by law or his successor elected and qualified. The person so appointed shall take the oath and give bond required by law of the regular incumbent."

Sections 40-206, 40-1301, and 47-701 are within the constitutional provisions for the suspension of the State Treasurer, and provide a separate and distinct remedy for his suspension. The provision of the act of 1876 contained in section 40-1301 was not repealed by the constitution of 1877, or by the act of 1879, con-

tained in sections 40-206 and 47-701. Each section must be dealt with as though it were contained in the same act of the legislature. The adoption of the Code of 1933 (Ga. L. 1933, p. 84) amounted to a re-enactment of each section as contemporary statutes of the State. *Gramling* v. *Poole,* 111 *Ga.* 93 (36 S. E. 430); *Davis* v. *Davison,* 160 *Ga.* 545 (128 S. E. 743); *Central of Georgia Railway Co.* v. *State,* 104 *Ga.* 831 (31 S. E. 531, 42 L. R. A. 518). They should be construed as if they were separate paragraphs of the same statute. *Gillis* v. *Gillis,* 96 *Ga.* 1 (23 S. E. 107, 30 L. R. A. 143, 51 Am. St. R. 121). It is the duty of the courts, where possible, to give an act such construction as will give full force and effect to all of its provisions. Code sections relating to the same subject-matter and codified at the same time should be construed, if possible, to harmonize with each other, and that construction should be adopted as will prevent a contradiction by one section of the other, and so that both will be operative. *Gray* v. *McLendon,* 134 *Ga.* 224 (67 S. E. 859); *Bealle* v. *Southern Bank of Georgia,* 57 *Ga.* 274; *Thomasson* v. *Fannin,* 54 *Ga.* 361. Giving such construction to these sections of the Code, it is clear that the law provides three methods, neither inconsistent with the other, by which the State Treasurer may be suspended, one by the General Assembly, one by the Governor on the finding of the council, and the other by the Governor on trustworthy information. Section 40-1301, providing for suspension on finding of the council, contemplates a finding after an examination into the truth of the charge, while section 40-206 does not contemplate any hearing on the charge. Section 40-206 contemplates that there might arise a situation where immediate suspension is necessary to protect the State. Should the Treasurer become insane, must the office suffer the hazard of being occupied by a lunatic, or cease to function until a lunacy trial, or until a guardian be appointed and a hearing had? Suppose the Treasurer should abscond, what kind of notice could be given him; and when could a hearing be had? If notice by publication, when, how and by whom would it be published? In the meantime must the wheels of the State stop for the want of a Treasurer? The Governor might have information that the funds or securities of the State were about to be misappropriated or unlawfully converted, and that to await the delay of a trial after notice of the charge would be too

late to prevent the wrong. It is of no use to lock the stable door after the mule is stolen. It seems the legislature considered the provisions of section 40-1301, providing for a suspension of the Treasurer, inadequate to meet all contingencies. Evidently the legislature by the enactment of section 40-206, providing for suspension by the Governor, intended to safeguard against the emergency. The law places the responsibility on the Governor. It is his duty to act when he has what appears to him trustworthy information that the State Treasurer is insane, or has absconded, or grossly neglects his duty, or is guilty of conduct plainly violative of his duties, or demeans himself in office to the hazard of the public funds or credit of the State. The Governor may act, according to the exigencies of the case, under either section 40-206 or 40-1301. In either case, when the council finds the charges are true, or when the Governor moves under section 40-206, he must suspend the Treasurer and refer his action to the next legislature. It is a suspension, and not a removal. While in a way it may seem to be equivalent to removal, because of the fact that the term may expire pending the suspension, yet in law it is not a removal, but by the very terms of the law is a suspension. If the legislature otherwise directs, the suspended officer will be restored to office and entitled to compensation as though he had not been suspended. It is argued that the decisions in *Coleman* v. *Glenn*, 103 *Ga.* 458 (30 S. E. 297, 68 Am. St. R. 108), *Ledbetter* v. *Reese*, 148 *Ga.* 633 (97 S. E. 669), and *Talmadge* v. *Cordell*, 167 *Ga.* 594 (146 S. E. 467), are authority that the Treasurer may not be lawfully suspended without notice and hearing. Those decisions were dealing, not with suspension, but removal. The writer of this opinion was the trial judge in the *Cordell* case. In that case Talmadge, now Governor, then Commissioner of Agriculture, removed Cordell, a fertilizer inspector, from office without notice or hearing. Such procedure was not, in the opinion of the writer, in accord with the interpretation of the law by this court in such cases; so we found against the Commissioner. The ruling was affirmed by this court. In the *Cordell* case we did not hesitate to follow the law as we understood it. Here we also track the law.

A suspension from office does not destroy but merely suspends the acquired right to the office. 46 C. J. 983, § 144. A suspension from office and a removal from office convey very different ideas.

In the case of suspension it is contemplated that the suspended officer may be restored to his office and hold the same by virtue of his original title, while in case of removal the title of the removed officer is permanently lost to him. State *v.* Heinmiller, 38 Ohio St. 101. Neither the constitution nor the act putting its provision in effect provides for a hearing. It is not necessary, however, for us to consider whether one may be removed from office without a hearing. The section under which the Governor acted provides merely for a suspension, and such may be had without a hearing. *Gray* v. *McLendon,* supra. It was not intended by the framers of the constitution or the legislature that a hearing should be had. There is no reason why the courts should write such meaning into the act. To do so would not be in accord with its letter and purpose. It might in some cases defeat its operation and render the statute futile. "The suspension of an officer pending his trial for misconduct, so far as to tie his hands for the time being, seems to be universally accepted as a fair, salutary, and often necessary incident to the situation. His retention at such a time of all the advantages and opportunities afforded by official position may enable and encourage him, not only to persist in the rebellious practices complained of, but also to seriously embarrass his triors in their approaches to the ends of justice. These considerations have a special force as applied to officers entrusted with public monies. The running of the governmental machinery is so intimately connected with, and dependent upon, the public treasury that, unless summary power and a speedy remedy be lodged somewhere, great danger to the public may ensue. The safety of the State, which is the highest law, imperatively requires the suspension, pending his trial, of a public officer—especially a custodian of public funds—charged with malfeasance or nonfeasance in office. Suspension does not remove the officer, but merely prevents him, for the time being, from performing the functions of his office, and, from the very necessities of the case, must precede a trial or hearing. Such temporary suspension without previous hearing is fully in accordance with the analogies of the law." State *v.* Police Commissioners, 16 Mo. App. 48; Griner *v.* Thomas, 101 Tex. 36 (104 S. W. 1058). Suspension of public officers is a matter separate and apart from the removal of public officers. Cases relating to the exercise of the power of removal are without application to a stat-

ute relating to the suspension of public officers. 22 R. C. L. 564, § 270. The validity of the order of suspension does not depend on a statement of fact therein sufficient to show that the cause of the suspension existed. All officers are presumed to do their duty. *Ledbetter* v. *Reese,* 147 *Ga.* 710 (95 S. E. 209). The statute providing for the suspension does not require any statement of fact from the Governor upon which he acts. It provides for him to act on trustworthy information, information that is satisfactory to him. It may be that the legislature did not think it wise to require the Governor to disclose his information or its source. Often information is more readily given when secret. Judgments or findings of tribunals do not ordinarily require, to give them validity, a statement of the evidence upon which they are found. Be this as it may, there is no provision of the statute or rule in this State compelling the order of suspension to disclose the evidence upon which it is made.

■ It is not our office to inquire into the wisdom of the legislature in clothing the Governor with the responsibility, under certain circumstances, to suspend the State Treasurer. There is ample argument to show that the power should be lodged somewhere. Here it is in the Governor. The only limitation on his discretion is that he must act on trustworthy information and report his action to the General Assembly. This is not the first case where a Governor of the State suspended an officer elected by the people. A former Governor, Hoke Smith, suspended a member of the Railroad Commission. In dealing with the case growing out of such suspension this court held, in *Gray* v. *McLendon,* supra, that the suspension might be had, and was legal without notice or hearing. Under section 40-206, the Governor decides whether or not the cause for suspension exists. It is no answer to say that the power is subject to abuse. All discretionary power is subject to abuse; but in the very nature of things, in order to secure, insure, and preserve the functions of government, it must in many cases be lodged in some officer of the State. The legislature has chosen, in this instance, to confer this power upon the Governor, with the requirement that he report his action to the legislature. The exercise of this power under the sanction of his official duty and obligation to the State is not subject to review or control by the courts. The remedy for inquiry and review to correct any error that may

grow out of its exercise is reserved unto and conferred upon the legislature. *Gray* v. *McLendon,* supra; *Felton* v. *Huiet,* 178 *Ga.* 311 (173 S. E. 660); *State* v. *Western & Atlantic R. Co.,* 136 *Ga.* 619 (71 S. E. 1055); Griner v. Thomas, supra; State ex rel. Short v. Brownlee, 96 Okla. 250 (222 Pac. 232); Botany Worsted Mills v. U. S., 278 U. S. 282 (49 Sup. Ct. 129, 73 L. ed. 124); 25 R. C. L. 982, § 229; 12 R. C. L. 1008, 1010; 46 C. J. 983.

■ A de jure officer is one who occupies by right a de jure office. A de jure office is one lawfully created. A person eligible to fill a de jure office, when duly appointed or elected to such office, upon his qualification and commission by the proper authority becomes a de jure officer. "And if a public office is vacant because of incumbent's suspension, it becomes, as to the suspended person, for the time being as though it did not exist, and as to the public the person appointed to fill the vacancy is the sole incumbent of the office." 46 C. J. 983, § 144; Gray v. Independence County, 166 Ark. 502 (226 S. W. 465), and cit. Where there is an office and there arises therein a suspension by vacancy, and another is appointed by the appointing power to fill such vacancy, and the appointee qualifies and is duly commissioned, such appointee becomes, until the suspension is removed, a de jure officer as to such office. The public may lawfully deal with him as such officer, and therein is fully protected. The conclusion inevitably follows that the lawful authority vested in the Governor the power to suspend the State Treasurer and to appoint another to perform the duties of the office during the suspension. The Governor having suspended Hamilton as Treasurer in accordance with the provisions of the statute, and having appointed and commissioned Daniel as State Treasurer to fill the vacancy caused by the suspension, Daniel, having qualified and assumed the duties of the office as such, became and is, during the suspension, the de jure State Treasurer. All persons having business with the State Treasurer are lawfully authorized to deal with him as such, and in such relation they are fully protected by the law. It is not necessary for us to consider whether Daniel would be a good de facto officer, for the reason that under the admitted facts of the case he is a de jure officer occupying a de jure office, that of State Treasurer.

■ The petition does not present a case for interpleader. The rule of the Code authorizing an interpleader is as follows: "37-

1503. (5471) Grounds for grant of interpleader.—Whenever a person shall be possessed of property or funds, or owe a debt or duty, to which more than one person shall lay claim of such a character as to render it doubtful or dangerous for the holder to act, he may apply to equity to compel the claimants to interplead." The doubt or danger may arise either in law or in fact as to the person to whom the money should be paid. *Western & Atlantic Railroad Co.* v. *Union Investment Co., 128 Ga. 74 (57 S. E. 100).* The instant case does not come within the rule for interpleader. The law clearly authorized the Governor to suspend the Treasurer and appoint another in his place. We know judicially that this was done. Code, § 38-112. "The Supreme Court is bound to take notice of who are public officers of this State, where the law requires such officers to be commissioned by the Governor." *Abrams* v. *State, 121 Ga. 170 (48 S. E. 965).* The citizen, as well as the courts, also in law knows this without further proof. We know this also from the pleadings. The suspension and the appointment were made in conformity to the law. During the suspension Hamilton is out, stripped of the authority and functions of the office, while Daniel, the appointee, is in, clothed by the law with full authority to perform all the duties of the office. The doubt referred to in the law that would authorize an interpleader must be reasonable. One may not create for himself a doubt in order to excuse himself from an obligation. It is not intended that one merely quibbling over the law or facts may resort to interpleader and thereby postpone or relieve himself of the performance of a required duty. The doubt must be reasonable and the danger apparent. In this case there is no reasonable doubt under the law as to what person is authorized to receive the State funds and to hold the State securities, or that there would be any danger in accounting to him for such. Daniel, the appointee during the suspension, is the State Treasurer and as such is authorized to receive the State funds. It was admitted on the argument of the case before us, and such could not be well denied, that if the suspension of Hamilton was authorized and done in accordance with law, and Daniel was regularly appointed and commissioned to fill the vacancy caused by the suspension, the bank could pay over the State funds in its deposit to Daniel as Treasurer and in such be relieved of any further liability. So it appears beyond question that the bank may

relieve itself of all obligation to the State in reference to the deposit, and free itself from any further liability thereunder, by simply paying the money to the Treasurer, Daniel, the officer authorized to receive the same. Under such circumstances there is no ground for the interpleader. In so deciding we have not found it necessary to consider whether or not the bank could have safely paid the money to Mobley, under the direction of the Governor, and thus avoided the necessity of an interpleader. Having held there is no sufficient ground for the interpleader, it follows that the cross-petition will not lie. 15 R. C. L. 232, § 15; *Smith* v. *Horton*, 144 *Ga.* 495 (87 S. E. 655). Whereupon we hold that the court, on the grounds herein discussed, erred in overruling the demurrers to the petition and cross-petition. Both should have been dismissed on the demurrers. The failure to sustain the demurrers renders nugatory the judgment of the court as to other matters in the petition and cross-petition. Having decided the case upon the issues herein stated and discussed, it is unnecessary to consider and decide other questions raised by the record, which we find are unessential to its proper determination.

*Judgment reversed. Presiding Justice Beck, Justice Hutcheson, and Judges Dickerson and Rourke concur. Judge Knox dissents.*

BECK, Presiding Justice, concurring specially. I am of the opinion that the petition for interpleader in this case should have been dismissed, because a court of equity is without jurisdiction to decide the right of either the plaintiff in error or Hamilton to the office of Treasurer of the State; but since the majority have seen fit to go directly into the question as to whether or not Daniel is the de jure Treasurer, I concur in their holding as to that question.

KNOX, Judge, dissenting. In the opinion rendered by the majority of the court two conclusions have been reached, the first being that the Governor was legally justified in suspending the State Treasurer, while the second holds that the facts of the case do not authorize the granting of a bill of interpleader. The opinion further states that with these two issues adjudicated a consideration of the other questions involved in the record is not necessary. I am not in accord with either of the conclusions reached by the majority opinion, and I can not concur in its findings. The case of plaintiff in error is necessarily based upon two legal propositions. The first of these is that the Governor under the provisions of the

statute is vested with arbitrary power and discretion to supend the Treasurer, without limitation, except that he must be in possession of information which he considers trustworthy that one or more of the causes of suspension specified in the statute exists. This proposition carries with it the assumption that he is the sole judge as to whether or not the information is trustworthy, and that he is not required to make any preliminary investigation of the facts upon which such information is based. The second proposition is, that, under the provisions of the statute, the exclusive power to review the action of the Governor is reserved unto and conferred upon the General Assembly, and that his action can not be inquired into by any other authority or tribunal. This proposition carries with it the assumption that the General Assembly is not only authorized, but required, to take cognizance of the proceeding, to hear the same on its merits, and to render a judgment of approval or disapproval. The case of the plaintiff in error being dependent upon these two propositions, his case fails if either is erroneous, for each is of necessity dependent upon the other. These propositions will be discussed in their inverse order.

The statute, after conferring upon the Governor the right to suspend the Treasurer for the causes specified, provides that *the Governor shall report his reasons for such suspension to the General Assembly, and that such suspension shall continue until the General Assembly otherwise directs.* Nothing else contained in the statute can possibly be construed as conferring the power to review in the legislature. There is nothing in this language which, expressly or by necessary implication, either authorizes or requires the General Assembly to take cognizance of the proceeding and to review the Governor's action. Properly construed, this language merely confers upon the General Assembly a plenary power to reinstate after a suspension is made by the Governor. This question was discussed with some elaboration in the case of *Gray* v. *McLendon*, 134 *Ga.* 224 (supra), in which this court had under review a case where the Governor had suspended a member of the Railroad Commission, the suspension being under the provisions of a statute approved by the General Assembly on October 14, 1879. This statute, after conferring upon the Governor the power to suspend members of the Commission, provides that *the Governor shall report the fact of such suspension, and the reasons therefor, to the*

*next General Assembly; and if a majority of each branch of the General Assembly declare that said commissioner shall be removed from office, his term of office shall expire.*

It will be observed that the language of the statute then under consideration and that now discussed were to the same general effect, except in one case the General Assembly reserved the right to remove from office after suspension by the Governor, while in the other it reserved the power to reinstate after such suspension. In discussing that case this court held that the provision that the Governor should report the reasons of his suspension to the General Assembly was merely a directory one, the only purpose of which was to furnish information to the General Assembly and the general public. It further held that the Governor was not as a matter of fact required to make the report. If he did so, the General Assembly in any action taken by it might take into consideration the reasons assigned by the Governor, or might base its action upon entirely different reasons. In other words, that the right to remove is a plenary power that may be exercised by the legislature entirely independent of and without reference to reasons motivating the Governor's action. And while the court did not in exact language hold that the General Assembly might in its discretion ignore the entire proceeding, the whole logic and reasoning of the decision makes this conclusion inescapable. Applying, therefore, the reasoning of that decision to the facts of this case, it appears that the General Assembly has not reserved unto itself any exclusive power of review of the Governor's action in suspending the Treasurer. This is necessarily true, as a power to review naturally presupposes, not only a requirement to take cognizance of the proceeding to be reviewed, but a like requirement to inquire into the merits of the controversy and to render a judgment in accordance therewith. It therefore follows, since the General Assembly is not required to take any cognizance of the proceedings, that the exclusive power to review the same is not lodged with that tribunal; and since it is not confined to the reasons motivating the Governor, its judgment could not be a review of his action. Then, too, it must be remembered that the Governor is not required to make any report of his reasons, the provision of the statute to this effect being directory and not mandatory. Such being the case, the legislature would not have available anything in the way of a

record to review, except the order of suspension passed by the Governor. In the present case the suspension merely recited that the Governor was in possession of trustworthy information to the effect that three of the causes of suspension specified in the statute existed, without giving any facts upon which such conclusions were based. It would, of course, be manifestly impossible for the legislature to review a record consisting only of such order.

It is admitted that the Governor suspended the Treasurer without notice and without a hearing. Even if the Treasurer was in possession of the facts upon which the suspension was based, it is evident that he was not afforded an opportunity to defend against them. Under such circumstances, .even if the Governor makes a report of his reasons for such suspension to the General Assembly for the purpose of review, any review made will necessarily be a review of an ex parte proceeding at which only one side of the controversy was heard. That would not be true if the Treasurer were permitted to appear before the General Assembly and make a defense, but no provision is made for such appearance by the terms of the statute. Even if there were, the legislature is not confined in its action to the reasons specified in the order of suspension, but in its discretion can ignore the same and act upon reasons independent thereof. Therefore the contention that the power to review is vested exclusively in the General Assembly is wholly erroneous. In this connection it is advisable to examine the authorities relating to the suspension and removal of public officials from office, which have been rendered by the courts of last resort in this State and other jurisdictions. Such authorities are numerous, and apparently deal with every phase of the subject. They deal with the different classes of suspensions and removals and the various grounds upon which they are based. For instance there are decisions dealing with suspensions which are only temporary and others dealing with suspensions that run for an indefinite period. They deal with those classes of the subject where the power to suspend or remove is arbitrary and without limitation, and those that can only be exercised for cause. It is not necessary to cite the same here. While informative upon the general subject under consideration, none appear to be so exactly in point as to be controlling upon the questions involved here. Then, too, an overabundance of authority not directly applicable to the facts of a case often tends to confuse

rather than to simplify an issue. There is however, one principle of law that appears to stand out from the multitude as free and clear of both doubt and difficulty, and which has been generally accepted and approved by the courts of this State and those of practically all other jurisdictions. That is the rule of law, that where a public officer has been selected for a term fixed by law, and is removable only for cause, he can not be deprived of his office for an indefinite period of time, without notice, without a hearing, and without an opportunity to defend himself against the charges upon which his removal is based. There must be convened at some time, somewhere, an authorized tribunal where he is privileged to appear and be heard. This privilege amounts to a legal right, and cannot be ignored or denied. The authority exercising the power to remove may be the tribunal before whom the hearing is had, or it may be before another that is specified by the statute; but the right to be heard can not be denied. This rule applies to all public officers alike who occupy the position above stated, regardless of whether they are appointed or elected by the people, and without reference to the importance or unimportance of the office they hold. It would appear to apply with special force to the Treasurer or Comptroller-General of this State, who are constitutional officials elected by the people for a fixed term, and whose offices rank in dignity and importance with that of the chief executive himself. *Coleman* v. *Glenn,* 103 *Ga.* 458 (supra); *Edge* v. *Holcombe,* 136 *Ga.* 765 (70 S. E. 644); *Ledbetter* v. *Reese,* 148 *Ga.* 633 (supra); *Holder* v. *Anderson,* 160 *Ga.* 433 (128 S. E. 181); *Talmadge* v. *Cordell,* 167 *Ga.* 594 (supra).

It is argued that a distinction exists between removals from office and suspensions from office, and that this principle is not applicable to suspensions. The distinction referred to does exist, but it is not such a distinction as prevents the rule being applicable in the case of suspensions running for an indefinite period. As a matter of fact the principle has been definitely held applicable in suspensions of the character indicated. McDowell *v.* Burnett, 92 S. C. 469 (75 S. E. 873), Sullivan *v.* King, 98 S. C. 314 (82 S. E. 408). It is only in suspensions of a temporary nature, pending the trial of the officer sought to be deprived of office, that the rule is not applicable. Naturally in such cases this principle is not of force. But where the suspension is for an indefinite period of time, the

rule applies with the same force that it does in cases of actual removal from office. There is, as a matter of fact, no real basic distinction between this class of suspensions and a removal from office. In both cases the officer is deprived of his office to the end of his term. The effect is the same and each is equivalent to the other. The Governor in this case, as already stated, suspended the Treasurer without notice and without a hearing. He has not intimated that he purposes to give him a hearing at any future time. He is in fact not authorized to do so; for with the passing of the suspension order his jurisdiction in the matter ended. There is no other tribunal authorized or required to afford a hearing in the premises; so it naturally follows that the Treasurer has been finally deprived of a hearing. This is an invasion of his legal rights, and renders unlawful his suspension under such circumstances. The order of suspension passed by the Governor is therefore a mere nullity.

Reverting to the first proposition herein stated, I can not accept the construction placed upon the statute by the plaintiff in error; for I can not agree that the Governor is the sole judge of the term, "trustworthy information." So to construe the term would be to give the statute a meaning that I can not think the legislators who enacted it meant for it to have. It would enable the Governor to act upon any unfounded rumor or suspicion which he, in his discretion, might term trustworthy information. It would enable him to suspend the Treasurer and Comptroller-General of the State at any time, arbitrarily and without limitation, notwithstanding the fact that this authority is specifically limited to cause. A study of the statute convinces me that it was not intended that this power be conferred upon him. Instead of being a term to be loosely construed in the discretion of the Governor, as contended, I think the term "trustworthy information" is a tangible one that has a meaning. It could properly and reasonably be construed as the equivalent of satisfactory proof; for trustworthy information is satisfactory proof, and satisfactory proof is trustworthy information. The same words used in different connections often have different meanings. Therefore these words should not be construed alone, but with and in the light of the remaining language of the statute, and with this done the whole statute so construed as to give the same a reasonable meaning; that is to

say, one in keeping with the evident intention of the members of the General Assembly who enacted the legislation. I do not think that it can reasonably be asserted that it is the intention of this statute to confer upon the Governor the authority to suspend these officials arbitrarily and without limitation; for it plainly does not fall within that class of suspensions. On the contrary the power to suspend is not only limited to cause but is specifically limited to the five particular instances named in the statute, each of which constitutes cause of grave nature and serious import.

If, then, it is contended that the statute as a whole is in some respects ambiguous and capable of different constructions, it is the duty of the court to construe it in an effort to ascertain the intention of the legislators who enacted it. This must be done, where possible, from the language of the statute; but in seeking this end the court is not entirely restricted to the language itself. Judicial cognizance can properly be taken of historical matters that are informative as to the trend of the legislative mind at the time the legislation was enacted. In this connection, it will be remembered that our present constitution was adopted in the year 1877, or twelve years after the end of the War between the States. The framers of the constitution lived in Georgia during that tragic era when the public affairs of the State were in control of a regime commonly known as the "carpet-baggers." They were naturally informed as to the various indignities suffered by the people under the administration of this regime, and of the deep resentment these outrages incurred among our citizens. It is probable that no other one thing so incensed the people as the disgraceful and unlawful manner in which the public funds of the State were squandered and expended. It is natural to assume, therefore, that the representatives of the Constitutional Convention entered upon their duties strongly impressed with the imperative necessity of safeguarding the public treasury from unlawful and unwarranted expenditures. That they were so impressed is demonstrated by the result of their labors. They wrote into the organic law of this State a provision that no warrant can be paid out of the public treasury unless the same is signed by the Governor. But they did not stop there. They further provided that even though the warrant was signed by the Governor it should not be paid unless it was also countersigned by the Comptroller-General. But this was not

all. They further provided, that, even though a warrant was signed by the Governor and countersigned by the Comptroller-General, it should not be paid by the Treasurer unless the General Assembly had provided for the payment of the same by appropriation. It will thus be seen that under our constitution no funds can legally be withdrawn from the public treasury without the concurrent action and acquiescence of these three public officials. This is the scheme of our State government. It is intended that each of these officials shall be a check upon the other, and the solemn duty of safeguarding the public funds of the State rests with equal force upon each of them. In this respect they are of equal importance for each has an equal obligation in the protection of the treasury. The statute under consideration was approved during the year 1879, or two years after the adoption of the constitution. It was enacted by members of the General Assembly who were also citizens of the State during the period of reconstruction. They, too, were fully advised of the unlawful manner in which the treasury had been looted during that distressing era. It is safe to assume that they also were concerned with the protection of the public funds of the State, and shared with the framers of the constitution a determination to safeguard them. Such being the case, it is hardly probable then that these men would enact a statute the effect of which would be effectually to destroy these barriers of protection which the members of the Constitutional Convention had so painstakingly erected only two years before. I can not think that the members of the General Assembly intended any such thing, or that they even remotely contemplated granting any such power.

The banking institution involved here, under the facts of the case, occupies the status of a stakeholder. Parties occupying this position are not required to make decisions at their hazard and peril, but are permitted to ask direction of the courts. This is consistent with the principles of justice, equity, and common sense. Otherwise the law would impose upon its citizens hardships and burdens which are both unnecessary and unjustified. A bill of interpleader is an equitable remedy, and the facts of this case present a situation where the beneficent offices of equity can be invoked. In equity all pending actions can be consolidated and disposed of in one proceeding, and in equity the rights of all parties can be more readily ascertained and more economically adjusted. These rights,

of course, can also be more fully preserved and protected in an equitable action. Therefore the court properly granted the application for interpleader. The injunctive remedy here complained of was necessary to the full protection of the parties, and the temporary restraining order was properly granted. For the reasons herein stated I am unable to concur in the opinion rendered by the majority of the court, and I dissent from the rulings expressed therein.