S13Q0981. DeKALB COUNTY SCHOOL DISTRICT et al.
v. GEORGIA STATE BOARD OF EDUCATION et al.
(751 SE2d 827)

PER CURIAM.

The United States District Court for the Northern District of Georgia has certified questions to this Court about the constitutionality of OCGA § 20-2-73, which provides in certain circumstances for the suspension and removal of members of local boards of education.[1] Georgia law does not require that local school systems be accredited, but it permits school systems to seek accreditation from certain private accrediting agencies,[2] and it acknowledges the importance of such accreditation.[3] Pursuant to OCGA § 20-2-73, when an accredited school system "is placed on the level of accreditation immediately preceding loss of accreditation for school board governance related

---

[1] In 2013, the General Assembly amended OCGA § 20-2-73, Ga. L. 2013, p. 763, but the amendment was enacted only after the events from which this case arose. Unless otherwise specified, when we refer in this opinion to OCGA § 20-2-73, we refer to the statute as it existed prior to the 2013 amendment.

[2] Georgia law recognizes seven private accrediting agencies. See OCGA § 20-3-519 (6).

[3] Among other things, Georgia law provides that graduates of an accredited school system may be qualified for state scholarship programs that provide those graduates with substantial financial assistance for their post-secondary education. See, e.g., OCGA §§ 20-3-519 (6); 20-3-519.2 (a) (1) (A). We note as well that graduates of unaccredited schools may be subject to additional requirements for admission to public institutions of post-secondary education. See, e.g., "Admission Information for Students Who Are Home Educated or Who Attend a Non-Accredited High School," https://www.admissions.uga.edu/article/home-educated-or-non-accredited-high-school.html. Georgia law acknowledges that maintaining accreditation is a "clearly essential" measure of the success of a local board of education. OCGA § 20-2-49 ("And although there are many measures of the success of a local board of education, one is clearly essential: maintaining accreditation and the opportunities it allows the school system's students.").

reasons," the State Board of Education (the "State Board") must consider whether to recommend that the Governor "suspend all eligible members of the local board of education with pay," and if the State Board so recommends, the Governor may suspend those members with pay and appoint temporary replacements to the local board.[4] OCGA § 20-2-73 (a) (1). A suspended member may petition the Governor for reinstatement, but if a suspended member does not do so within 60 days of suspension, the suspended member is permanently removed from office, and the temporary replacement serves out the term of the suspended member. OCGA § 20-2-73 (b). If a suspended member does petition for reinstatement,

> the Governor or his or her designated agent shall conduct a hearing for the purpose of receiving evidence relative to whether the local board of education member's continued service on the local board of education is more likely than not to improve the ability of the local school system or school to retain . . . its accreditation. . . . If it is determined that it is more likely than not that the local board of education member's continued service on the local board of education improves the ability of the local school system or school to retain . . . its accreditation, the member shall be immediately reinstated; otherwise, the member shall be permanently removed, and the temporary replacement member shall become a permanent member and serve out the remainder of the term of the removed member or until the next general election which is at least six months after the member was permanently removed, whichever is sooner.

OCGA § 20-2-73 (c). The statute provides that any hearing on a petition for reinstatement is to be conducted pursuant to the Georgia Administrative Procedure Act, OCGA § 50-13-1 et seq., and it provides as well for judicial review of a decision to permanently remove a member. Id.

From the record in this case, it appears that the DeKalb County School District (the "DeKalb School District") was accredited by the

---

[4] Prior to the 2013 amendment, see note 1 supra, the statute did not define "eligible member." The State Board and the Governor in this case appear to have understood "eligible member" to mean a member of the local board of education at the time the school system "is placed on the level of accreditation immediately preceding loss of accreditation," and the parties in this case appear to take no issue with that understanding. In any event, the 2013 amendment expressly defines "eligible member" as "a board member who was serving on the local board at the time the accrediting agency placed the local school system or school on the level of accreditation immediately preceding loss of accreditation." Ga. L. 2013, p. 763, § 1.

Southern Association of Colleges and Schools ("SACS"), a private accrediting agency recognized by Georgia law. In December 2012, SACS placed the DeKalb School District on "accredited probation" for reasons related to the governance of the DeKalb County Board of Education (the "DeKalb Board"),[5] which left the DeKalb School District only one step away from a loss of its accreditation. Pursuant to OCGA § 20-2-73, the State Board then convened proceedings to determine whether to recommend that the Governor suspend the six members of the DeKalb Board who were serving at the time SACS put the DeKalb School District on accredited probation.[6] The State Board held hearings on January 17, 2013 and February 21, 2013, at which members of the DeKalb Board appeared with counsel, and the State Board heard evidence, including the testimony of several members. At the conclusion of the hearings, the State Board voted unanimously to recommend that the Governor suspend the six members of the DeKalb Board. On February 25, 2013, the Governor suspended these members, and he later appointed six temporary replacements, all of whom were recommended to the Governor by a nominating committee.

In the meantime, Dr. Eugene P. Walker — the chair of the DeKalb Board and one of the suspended members — filed a lawsuit in the United States District Court, alleging that OCGA § 20-2-73 violates both the United States Constitution and Georgia Constitution, and seeking declaratory and injunctive relief.[7] The District Court denied preliminary injunctive relief to Walker, finding that Walker had failed to show a substantial likelihood that he would prevail on his claim that the statute violates the United States Constitution. As to the Georgia Constitution, the District Court certified the questions to

---

[5] SACS placed the DeKalb School District on accredited probation after months of investigation, including site visits, a review of documents produced by the DeKalb School District, and interviews of educators and other interested persons identified and made available to SACS by the DeKalb School District. The placement on accredited probation also followed training and mediation sessions for members of the DeKalb Board, whereby SACS sought to help the DeKalb Board with respect to the governance issues about which SACS was concerned.

[6] The six members were Dr. Eugene P. Walker (the plaintiff in this case), Nancy Jester, Sarah Copelin-Wood, Jesse "Jay" Cunningham, Donna Edler, and Pamela A. Speaks. Three other members of the DeKalb Board had only been recently elected, and they were not serving on the DeKalb Board at the time SACS placed the DeKalb School District on accredited probation. See note 4, supra.

[7] See *DeKalb County School Dist. v. Ga. State Bd. of Ed.*, 2013 U.S. Dist. LEXIS 35840, Civil Action No. 1:13-CV-544-RWS (N.D. Ga. 2013). When the lawsuit was filed, the DeKalb School District also appeared as a plaintiff, and for that reason, the caption of the case in both the District Court and this Court identifies the DeKalb School District as a party. Nevertheless, the DeKalb School District later moved to withdraw from the lawsuit, the District Court granted its motion, and the DeKalb School District has made no appearance in this Court.

this Court, asking whether "OCGA § 20-2-73, or any portion thereof, violate[s] the Georgia Constitution."[8]

In his briefs to this Court, Walker contends that OCGA § 20-2-73 violates the Georgia Constitution in several respects. First, he argues that the General Assembly has no authority under our Constitution to provide by statute for the suspension and removal at law of members of a local board of education, who are constitutional officers. Second, he contends that even if the General Assembly has such authority, OCGA § 20-2-73 unconstitutionally delegates the power to suspend and remove the members of a local board of education to a private accrediting agency. Third, he argues that OCGA § 20-2-73 unconstitutionally vests the power of removal in the Governor, thereby effectively giving the Governor the power to control and manage local school systems, in violation of the separation of powers. Fourth, he asserts that OCGA § 20-2-73 unconstitutionally denies due process to members of a local board of education. We are unpersuaded by these contentions, and we conclude that OCGA § 20-2-73 does not violate the Georgia Constitution. Accordingly, we answer the questions of the District Court in the negative.

1. We begin with the contention that the General Assembly is without the authority under the Georgia Constitution to provide by statute for the removal at law of a member of a local board of education. The Constitution vests "[t]he legislative power of the state" in the General Assembly, Ga. Const. of 1983, Art. III, Sec. I, Par. I, and as we have explained, the lawmaking power of the General Assembly is "plenary." *Bryan v. Ga. Public Svc. Comm.*, 238 Ga. 572, 573 (234 SE2d 784) (1977). See also *Sears v. State of Ga.*, 232 Ga. 547, 553-554 (3) (208 SE2d 93) (1974) ("The inherent powers of our State General Assembly are awesome. . . . [The General Assembly] is absolutely unrestricted in its power to legislate, so long as it does not undertake to enact measures prohibited by the State or Federal Constitution." (Citation omitted)). For that reason, when this Court is asked to consider the constitutionality of an act of the General Assembly, we must indulge a strong presumption that it is a proper

---

[8] More specifically, the District Court asked us to consider the following:
Does OCGA § 20-2-73, or any portion thereof, violate the Georgia Constitution, either generally or by virtue of an affirmative answer to either of the following specific questions:
    (A) Does OCGA § 20-2-73 violate the Georgia constitutional doctrine that each school system shall be under the management and control of a board of education, the members of which shall be elected as provided by law? Or
    (B) Does the potential removal of school board members, as provided for by OCGA § 20-2-73, exceed the General Assembly's authority to enact general laws regarding local boards of education under Article VIII, Section V?

exercise of the legislative power, *SEIU v. Perdue*, 280 Ga. 379, 380 (628 SE2d 589) (2006), and this presumption can be overcome only by a showing of a "clear and palpable" conflict with the Constitution. *Dev. Auth. of DeKalb County v. State of Ga.*, 286 Ga. 36, 38 (1) (684 SE2d 856) (2009). With respect to OCGA § 20-2-73, we conclude that the strong presumption of constitutionality is especially warranted, and it has not been overcome in this case by a showing of a "clear and palpable" conflict with the Constitution.

(a) For several reasons, our recognition of a strong presumption of constitutionality is especially sound in this case. First, it is a fundamental principle of our constitutional tradition that no public officer — whether constitutional or only statutory — is above the law. See *United States v. Lee*, 106 U. S. 196, 220 (1 SCt 240, 27 LE 171) (1882) ("No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it."). See also *State ex rel. Low v. Towns*, 8 Ga. 360, 368 (1850) ("This is a government of laws and not of men . . . ."); *Bonner v. State ex rel. Pitts*, 7 Ga. 473, 481 (1849) ("Every officer, from the highest to the lowest, in our government is amenable to the laws of his country. . . . When the voice of the people speaks in the form of a legislative enactment, all are bound to obey the mandate. . . .").[9] But as we have explained, this fundamental principle would be "entirely nugatory and inoperative, if there was *no remedy* provided to enforce obedience to [the law]." *Bonner*, 7 Ga. at 483 (emphasis in original). Consequently, the law long has acknowledged that the power to provide the means by which a public officer might be suspended or removed at law from office for a failure to satisfy the qualifications of the office, for malfeasance in office, or for misfeasance in office is a power that necessarily inheres in the legislative power, except to the extent that the Constitution provides otherwise. See Throop, A Treatise on the Law Relating to Public Officers and Sureties in Official Bonds § 345 (1892) ("[T]he power of the legislature [with respect to the removal of public officers] is practically unlimited, except where it is limited by the provisions of the constitution, having express or implied reference to this particular subject.").[10] See also 67 CJS, Officers § 228 ("The authority to remove a public officer may be an incident of the sovereign power, and

---

[9] Although this fundamental principle runs throughout our Constitution, it is most clearly expressed in the provision that "[p]ublic officers are the trustees and servants of the people and are at all times amenable to them." Ga. Const. of 1983, Art. I, Sec. II, Par. I.

[10] This Court previously has cited this section of the Throop treatise with approval. See *Gray v. McLendon*, 134 Ga. 224, 250 (67 SE 859) (1910).

in the absence of constitutional restraint, the power is implied in all governmental operations."); 63C AmJur2d, Public Officers and Employees § 169 ("The legislative power extends to the subject of regulating removals from office."); *Ex parte Wiley*, 54 Ala. 226, 228 (1875) (with respect to removal of solicitor, "[t]he whole matter of removal or suspension from office, the causes for which, and the mode in which it may be effected, not being expressed in the Constitution, is a proper subject of legislation. It is part of the sovereignty of the State, part of the lawmaking power, and is not either expressly or impliedly withheld from the general assembly.").

Second, the notion that the power to provide for the removal of public officers — even constitutional officers — inheres in the legislative power finds support in our history and precedents. Throughout our history, the General Assembly has understood its legislative power to include the power to provide by general law for the removal of local constitutional officers for cause, notwithstanding that the Constitution did not explicitly and specifically confer such a power, and in some cases, even with respect to officers for whom the Constitution made other provision for their removal.[11] For instance:

---

[11] Early in the history of the State, the General Assembly also understood its legislative power to include the power to provide by general law for the suspension or removal of certain *state* constitutional officers by means other than those for which the Constitution provided. For instance, the General Assembly enacted a statute in 1826 that provided for the attorney general or a solicitor to be imprisoned for failure to "pay over moneys collected by them for the State," and in the event of such imprisonment, it authorized the judges of the superior court to "appoint, temporarily, some attorney to execute the duties [of the office]." Cobb's Digest, p. 1026. At that time, the attorney general and solicitors-general were constitutional judicial officers, entitled to "hold their offices for the term of three years, unless removed by sentence on impeachment, or by the governor on the address of two-thirds of each branch of the general assembly," Ga. Const. of 1798, Art. III, Sec. III, and the Constitution of 1798 made no provision for their temporary suspension. Under Section 166 of the Penal Code of 1833, a "member of the General Assembly or officer [of the State], Judge, [or] Justice . . . who shall accept or receive [a] bribe, shall on conviction . . . be removed from his office." Cobb's Digest, p. 805. At that time, judges of the superior courts were, according to the Constitution, "removable by the Governor upon the address of two-thirds of both branches of the General Assembly for that purpose, or by impeachment and conviction thereon." Ga. Const. of 1798, Amend. V (adopted December 19, 1818). And by the Constitution, members of the General Assembly were expressly removable only by impeachment, Ga. Const. of 1798, Art. I, Sec. X, or by expulsion by the chamber in which they sat, Art. I, Sec. XIII. Likewise, in the Code of 1873, it was provided that "[the secretary of state and comptroller general] shall not, directly or indirectly, be interested or engaged in the purchase and sale of wild lands or speculation, on pain of removal by the Governor or the General Assembly." Code of 1873, §§ 88 (secretary of state); 112 (comptroller general). At the time, both the secretary of state and comptroller general were constitutional officers, Ga. Const. of 1868, Art. IV, Sec. II, Par. VIII, and the Constitution made no provision for their removal, other than by impeachment.

The tide seems to have turned against the removal of *state* constitutional officers by general law without explicit constitutional sanction, however, by the late Nineteenth Century. In 1876, the General Assembly enacted a statute that authorized the Governor to suspend the state treasurer – a constitutional officer, Ga. Const. of 1868, Art. IV, Sec. II, Par. VIII – upon a

- The General Assembly enacted a statute in 1799[12] that provided for the removal of a clerk of the superior court upon "conviction . . . for malpractice in office," Cobb's Digest, p. 198, notwithstanding that the clerk was a constitutional officer, Ga. Const. of 1798, Art. III, Sec. X, that the clerk was subject to removal by impeachment, Ga. Const. of 1798, Art. I, Sec. X, and that the Constitution made no express provision for the removal of a clerk, other than by impeachment.[13]
- In 1833, the General Assembly enacted a Penal Code, Section 180 of which provided for a sheriff to "be dismissed from office" upon conviction for "voluntarily permit[ting] or suffer[ing] [an] offender [in his custody] to escape and go at large," and Section

---

finding by a majority of the attorney general, secretary of state, and comptroller general that the treasurer was "insane or manifestly insolvent, or that he has absconded or concealed himself, or is guilty of conduct which is to the hazard of the public treasury." Ga. L. 1876, p. 126, § 7. The suspension was to continue "until the next session of the General Assembly thereafter," id., and was, therefore, apparently in aid of the power of impeachment committed to the General Assembly. The Constitution of 1868 did not expressly provide for such a suspension, but the Constitution of 1877 – commissioned by the succeeding General Assembly – explicitly provided that "[t]he General Assembly shall have authority to provide by law for the suspension of [the treasurer or comptroller general] from the discharge of the duties of his office, and, also for the appointment of a suitable person to discharge the duties of the same." Ga. Const. of 1877, Art. V, Sec. I, Par. XVIII. But see *Daniel v. C&S Nat. Bank of Atlanta*, 182 Ga. 384 (185 SE 696) (1936) (upholding 1876 law, notwithstanding that "[t]he constitution of 1868 was silent as to the authority of the Governor to suspend the Treasurer"). Soon thereafter, there was some backtracking, as the General Assembly enacted a statute shortly after the adoption of the Constitution of 1877 that provided for the attorney general to be removed from office upon conviction for "charg[ing], demand[ing], or receiv[ing] any fee, perquisite, or compensation, other than his salary, in any case in which the state shall be a party or in any manner interested." Ga. L. 1878-1879, p. 157, §§ 1-2. But the parties point us to, and we have found, no general law enacted in the Twentieth Century that provides for the suspension or removal of a *state* constitutional officer other than by means expressly authorized in the Constitution.

[12] This statute was enacted on February 16, 1799, Cobb's Digest, p. 198, not quite nine months after the adoption of the Constitution of 1798. See Saye, A Constitutional History of Georgia, p. 157 (1948). Courts long have acknowledged that, when a legislature enacts a statute that touches upon a constitutional provision close in time to the adoption of that constitutional provision, the statute is powerful evidence of the contemporary understanding of the constitutional provision. See *Marsh v. Chambers*, 463 U. S. 783, 790 (II) (103 SCt 3330, 77 LE2d 1019) (1983).

[13] The Constitution of 1798 provided that clerks of the superior courts "shall continue in office during good behavior." Ga. Const. of 1798, Art. III, Sec. X. This provision cannot itself be understood as implying a power to remove for other than "good behavior," inasmuch as the justices of the inferior courts (Art. III, Sec. IV) and justices of the peace (see Art. III, Sec. V) also were entitled to continue in office "during good behavior," but the Constitution of 1798 expressly provided means other than impeachment for their removal at law. Indeed, the Constitution of 1798 provided specifically that justices of the peace were to be removed "by conviction on indictment in the superior court, for malpractice in office, or for any felonious or infamous crime." Ga. Const. of 1798, Art. III, Sec. V. We note as well that the Constitution of 1798 made express provision for the removal of numerous other constitutional officers other than by impeachment, including judges of the superior courts (Art. III, Sec. I), solicitors (Art. III, Sec. III), and sheriffs (Art. III, Sec. XI).

181 of which provided for a sheriff to "be dismissed from office" upon conviction for "refus[ing] to receive and take charge of [a] person [charged with an indictable offense]." Cobb's Digest, p. 807. At that time, the sheriff was a constitutional officer, and with respect to his removal, the Constitution of 1798 provided only that the sheriff was subject to removal "by sentence on impeachment[ ] or by the governor on the address of two-thirds of the justices of the inferior court and of the peace in the county." Ga. Const. of 1798, Art. III, Sec. XI. As to both clerks of the superior court and sheriffs, the Penal Code of 1833 also provided, in Section 195, that "[a]ny public officer who shall . . . be guilty of extortion in demanding and receiving other and greater fees than by law are allowed him . . . on conviction shall be punished by fine at the discretion of the [c]ourt, and shall moreover be dismissed from office." Cobb's Digest, p. 809.

- The General Assembly enacted a statute in 1865 to provide for judges of the superior court to convene a trial by special jury as to the incapacity of the county ordinary, and if the ordinary was found by the special jury to be incapacitated — by virtue of either physical or mental disability — he would be removed from office. Ga. L. 1865 Ex. Session, p. 58, §§ 2-3. At that time, the ordinary was an elected constitutional officer, Ga. Const. of 1861, Art. IV, Sec. III, Par. V, the ordinary was subject to removal by impeachment, Ga. Const. of 1861, Art. II, Sec. III, Par. IV, and the Constitution made no provision for the removal of the ordinary, other than by impeachment.[14]

- In 1925, the General Assembly enacted a statute to provide for the removal of a tax collector by the Governor upon a finding that the tax collector failed or refused to pay over moneys owed to the State or to other county officers, or that the tax collector made a false return. Ga. L. 1925, p. 79, § 5 (now codified, as subsequently amended, at OCGA § 48-5-145). By that time, the tax collector had been identified as a constitutional county officer. See *Morris v. Glover*, 121 Ga. 751, 754 (49 SE 786) (1905). By the

---

[14] Notably, the Constitution of 1861 made express provision for the removal of certain other constitutional officers by means other than impeachment, including the justices of this Court (Art. IV, Sec. I, Par. II), the judges of the superior courts (Art. IV, Sec. II, Par. I), and the State's attorney and solicitors (Art. IV, Sec. III, Par. II). We note as well that the Constitution of 1865 was adopted only a few months after this statute was enacted, but it too made no express provision for the removal of the ordinary, other than by impeachment. See Art. IV, Sec. III, Par. V.

Constitution of 1877, the tax collector was removable by impeachment (Art. III, Sec. VI, Par. III) and upon conviction "for malpractice in office" (Art. XI, Sec. II, Par. I). The Constitution of 1877, however, made no other express provision for the removal of the tax collector.

- In 1933, the General Assembly enacted a statute to provide for the Governor to suspend or remove a county tax collector, after a hearing, upon a finding that the tax collector failed to timely submit his account for settlement, or that he failed to promptly cure defaults ascertained upon examination of the account. Ga. L. 1933, p. 78, § 10 (now codified, as subsequently amended, at OCGA § 48-5-155). Again, under the Constitution of 1877, the tax collector was a constitutional county officer, the tax collector was subject to removal by impeachment or conviction "for malpractice in office," and the Constitution made no other provision for the removal of the tax collector.

- The General Assembly enacted a statute in 1978 providing that, "[i]f the [tax] digest is made out so badly as not to answer the purpose of the tax laws, the tax receiver or tax commissioner . . . shall be removed from office by the governing authority of the county on the request of the [State Revenue] Commissioner." Ga. L. 1978, p. 309, § 2 (now codified at OCGA § 48-5-205). At the time, the tax receiver and tax commissioner were constitutional county officers, see *Employees Retirement System v. Lewis*, 109 Ga. App. 476, 479 (2) (a) (136 SE2d 518) (1964),[15] and the Constitution made no provision for their removal other than by impeachment or upon conviction for malpractice.

The understanding of the General Assembly about the broad scope of its legislative power with respect to the removal of local constitutional officers goes back more than 200 years, and though that legislative precedent might not be dispositive, it is entitled to some respect. See generally *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U. S. 579, 610 (72 SCt 863, 96 LE 1153) (1952) (Frankfurter, J., concurring) ("The Constitution is a framework for government. Therefore the way the framework has consistently operated fairly establishes that it has operated according to its true nature. Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them.").

---

[15] In *Lucas v. Woodward*, 240 Ga. 770 (243 SE2d 28) (1978), this Court disapproved dicta in *Lewis* concerning the constitutional status of county commissioners, but we noted that *Lewis* otherwise accurately identified the constitutional county officers. 240 Ga. at 773, n. 7.

Although sparse, the judicial precedents point in the same direction. Nearly a century ago, our Court of Appeals held that the constitutional enumeration of certain means of removal of public officers does not necessarily foreclose removal otherwise by law, and in so doing, it acknowledged the inherent power of the General Assembly to provide by law for the removal of such officers — even local constitutional officers — subject, of course, to any constitutional limitation of that power. See *Kent v. State*, 18 Ga. App. 30, 32 (88 SE 913) (1916) (as applied to a county ordinary — a constitutional officer under the Constitution of 1877 for whom the Constitution made no express provision for removal other than by impeachment — removal provisions of the Penal Code of 1910, § 295 did not violate "those clauses of the constitution which provide for the impeachment of officers by the legislature only. . . . *The constitutional method and the legislative method of removing county and State officials from office are merely cumulative, and not conflicting.*" (Emphasis supplied)). And in 1975, this Court held that the General Assembly constitutionally provided for the removal of certain county commissioners by recall — assuming for the purposes of that case that the commissioners were constitutional "county officers" — notwithstanding that the Constitution of 1945 provided specifically for the removal at law of "county officers" upon "conviction for malpractice." See *Smith v. Abercrombie*, 235 Ga. 741, 747 (221 SE2d 802) (1975). For reasons that we will discuss later, removal by recall is political in nature, and it is not, therefore, the same as removal for cause at law. But we note that we said in *Smith* that the constitutional provision for removal upon "conviction for malpractice" was not one that limited the legislative power, and it "[did] not prohibit the General Assembly from enacting otherwise valid removal statutes." Id. In the light of the consistent understanding of our General Assembly since the founding, the judicial precedents, and the fundamental principles implicit in our constitutional tradition, it is evident that, at the time of the adoption of the Constitution of 1983, the legislative power was understood to include the power to provide by general law for the removal of local constitutional officers for cause, even without any express provision of the Constitution specifically conferring such a power. We now turn to consider whether any provision of the Constitution of 1983 limits the power of the General Assembly in this respect, specifically with regard to members of local boards of education.

(b) Nothing in the Constitution of 1983 "clear[ly] and palpabl[y]" limits the power of the General Assembly to provide by statute for the removal for cause of local constitutional officers. To begin, we note that the Constitution of 1983 expressly provides that the General Assembly may set additional "qualifications" beyond those required

by the Constitution itself to hold local constitutional offices — local boards of education (Art. VIII, Sec. V, Par. II), local school superintendents (Art. VIII, Sec. V, Par. III), and constitutional county officers (Art. IX, Sec. I, Par. III) — and these express provisions seem to confirm the presumption that the General Assembly may provide by law for the removal of such officers. After all, as we said recently in *Roberts v. Deal*, 290 Ga. 705, 708 (2) (723 SE2d 901) (2012), the power to establish qualifications to hold office "presumably authorizes the General Assembly to establish a mechanism for the administrative removal of board members [for a failure to satisfy such qualifications]."[16] With these things in mind, we consider the specific provisions of the Constitution upon which Walker relies.

(i) First, Walker argues that the power of the General Assembly to provide by general law for the removal of members of local boards of education is inconsistent with the constitutional commitment of the management and control of local school systems to locally elected boards of education. The Constitution provides that "[e]ach school system shall be under the management and control of a board of education, the members of which shall be elected as provided by law." Ga. Const. of 1983, Art. VIII, Sec. V, Par. II. The discretion of the local board to manage and control the school system is, as we have said before, "broad." *Thornton v. Clarke County School Dist.*, 270 Ga. 633, 635 (2) (514 SE2d 11) (1999). But as we recently explained, "[w]hile local boards of education have authority to manage and control the school system within their territory, they must do so in compliance with applicable constitutional and statutory laws." *Atlanta Ind. School System v. Atlanta Neighborhood Charter School, Inc.*, 293 Ga. 629, 633 (748 SE2d 884) (2013) (citations omitted). See also *Thornton*, 270 Ga. at 635 (2) ("[C]ourts will not interfere [with the discretion of a local board] *unless* there has been a violation of law or an abuse of discretion." (Emphasis supplied)). Again, no one in our Republic is above the law, and the law — OCGA § 20-2-73 — requires local boards of education to refrain from conduct that imperils the accreditation, if any, of the school systems that they control and manage. See also OCGA § 20-2-49 ("[A]lthough there are many measures of the success of a local board of education, one is clearly essential: maintaining accreditation and the opportunities it allows the school system's students.").

---

[16] At oral argument, Walker conceded as much, although he contends that OCGA § 20-2-73 cannot be fairly characterized as setting a "qualification" to hold office. We address that contention in Division 1 (c) below.

Moreover, the Constitution makes public education not only the business of local jurisdictions, but also the State as a whole. See Ga. Const. of 1983, Art. VIII, Sec. I, Par. I ("The provision of an adequate public education for the citizens shall be a primary obligation of the *State of Georgia.*" (Emphasis supplied)). Although school systems are committed to the management and control of local boards of education, the State has a substantial interest in ensuring that those local boards function competently and in a manner that does not imperil the education or future prospects of the students enrolled in the school systems. And although the Constitution provides that members of local boards be elected, it specifically contemplates a role for the State, leaving the time, place, and manner of the elections to the General Assembly, expressly providing that the General Assembly may impose "additional qualifications" to hold the office beyond those required by the Constitution itself, Ga. Const. of 1983, Art. VIII, Sec. V, Par. II, and providing that the power to fill vacancies on such boards may be exercised by the Governor or another public officer designated by law. See Ga. Const. of 1983, Art. V, Sec. II, Par. VIII. Finally, we note that OCGA § 20-2-73 is limited to the extraordinary circumstance of an imminent loss of accreditation, but whether to seek accreditation at all and from whom are questions that the law leaves in the first instance to local boards of education. Cf. *Atlanta Ind. School System*, 293 Ga. at 633-634 (finding no violation of principle of local control and management where "the local school board has consented to the creation of the start-up charter schools, and therefore, application of all provisions of the Charter Schools Act). Considering all these things, we cannot say that the legislative power to provide by statute for the removal for cause of members of local boards of education is "clear[ly] and palpabl[y]" inconsistent with the constitutional commitment of the control and management of local school systems to local boards of education.

(ii) Second, Walker notes that the Constitution of 1983 specifically authorizes the General Assembly to provide by general law for the removal of certain constitutional officers — the state constitutional boards and district attorneys — but says nothing expressly about the removal at law of local constitutional officers, including members of local boards of education. This constitutional silence about the removal of members of local boards can only be understood, Walker urges, to deny the General Assembly the power to provide for their removal by general law. Although this textual argument has some superficial appeal, it loses that appeal upon closer examination

of the constitutional history of the State, the structure of the Constitution of 1983, and the original understanding of the Constitution of 1983 as evidenced by legislation enacted contemporaneous with its adoption.

First, remember that the General Assembly has for many years treated *state* constitutional officers and *local* constitutional officers differently with respect to removal by general law. At least by the turn of the Twentieth Century, the General Assembly seems to have given up the idea that it might provide by general law for the removal of *state* constitutional officers except to the extent that the Constitution explicitly authorized it to do so. See note 11 supra. But beginning as early as 1799, and continuing right up to the adoption of the Constitution of 1983, the General Assembly has enacted laws to provide for the removal of *local* constitutional officers for cause, even where the Constitution did not specifically confer such a power, and even where the Constitution otherwise provided a means for the removal of such officers. And the courts have upheld those statutes. See, e.g., *Kent*, 18 Ga. App. at 32. It is unsurprising, therefore, that the Constitution of 1983 would specify the instances in which the General Assembly could provide by general law for the removal of *state* constitutional officers, but would say nothing about the presumed and settled power to provide by general law for the removal of *local* constitutional officers.

Moreover, until the Constitution of 1983, the impeachment power in this State ran equally to *all* constitutional officers, both state and local. See, e.g., Ga. Const. of 1798, Art. I, Sec. X ("all persons who have been or may be in office"); Ga. Const. of 1861, Art. II, Sec. III, Par. IV (same); Ga. Const. of 1865, Art. II, Sec. III, Par. IV (same); Ga. Const. of 1868, Art. III, Sec. III, Par. V ("all persons who shall have been or may be in office"); Ga. Const. of 1877, Art. III, Sec. VI, Par. III ("all persons who shall have been, or may be, in office"); Ga. Const. of 1945, Art. III, Sec. VI, Par. III ("all persons who shall have been or may be in office"); Ga. Const. of 1976, Art. III, Sec. VI, Par. I (same). That changed, however, with the Constitution of 1983, which limited the impeachment power to *state* officers: "The House of Representatives shall have the sole power to vote impeachment charges against *any executive or judicial officer of this state or any member of the General Assembly*." Ga. Const. of 1983, Art. III, Sec. VII, Par. I (emphasis supplied). The contemporary understanding in American law generally is that, "where a state constitution fixes the term of a public officer and provides for the officer's removal by impeachment, impeachment is the sole remedy to effect removal from office." 63C AmJur2d, Public Officers & Employees § 214. Although Georgia might historically have had a different understanding — at least with

respect to *local* constitutional officers — the general contemporary understanding might explain as well why the Constitution of 1983 would specify other means of removal (constitutional or statutory) for state officers subject to removal by impeachment, but not for local constitutional officers who are not subject to impeachment. See *In re Spivey*, 480 SE2d 693, 697-698 (N.C. 1997) (district attorney was subject to statutory removal where he was not among the officers subject to impeachment, and where the constitution was otherwise silent as to his removal).

And indeed, that is exactly what the Constitution of 1983 does. As to every *state* constitutional officer subject to impeachment, the Constitution either specifies an alternative constitutional means of removal or expressly provides for removal pursuant to general law. With respect to the Governor and the other state executive constitutional officers — the Lieutenant Governor, the Secretary of State, the Attorney General, the Commissioner of Insurance, the Commissioner of Agriculture, the Commissioner of Labor, and the State School Superintendent — the Constitution itself identifies means for their suspension or removal other than by impeachment. See, e.g., Ga. Const. of 1983, Art. II, Sec. III, Par. I (suspension of Governor and state executive constitutional officers upon recommendation of special commission following felony indictment); Art. II, Sec. III, Par. II (removal of Governor and state executive constitutional officers upon felony conviction); Art. V, Sec. IV, Par. III (removal of Governor and state executive constitutional officers upon finding by Supreme Court of permanent disability). With respect to the judicial officers of the State, the Constitution provides that "[t]he power to discipline, remove, and cause involuntary retirement of judges shall be vested in the Judicial Qualifications Commission," (Ga. Const. of 1983, Art. VI, Sec. VII, Par. VI), subject to final review of any removal by the Supreme Court (Art. VI, Sec. VII, Par. VIII). With respect to district attorneys and the state constitutional boards and commissions — the Public Service Commission, Board of Pardons and Paroles, State Personnel Board, State Transportation Board, Veterans Service Board, Board of Natural Resources, State Board of Education, and Board of Regents — the Constitution provides for removal pursuant to general law. See, e.g., Ga. Const. of 1983, Art. IV, Sec. VII, Par. I (as to members of Article IV constitutional boards and commissions, "removal from office . . . shall be as provided by law"); Art. VI, Sec. VIII, Par. II ("Any district attorney may be disciplined, removed or involuntarily retired as provided by general law."); Art. VIII, Sec. II, Par. I ("The . . . removal from office of the members of the [state] board of education shall be as provided by law."); Art. VIII, Sec. IV, Par. I ("The . . . removal from office of the members of the board of regents shall be as

provided by law."). There is, however, nothing at all in the Constitution about the removal at law of three kinds of constitutional officers: members of local boards of education, local school superintendents, and constitutional county officers. And those happen to be the same three kinds of constitutional officers that are not subject to the impeachment power.

This understanding is consistent with the original understanding of the Constitution of 1983 as evidenced by nearly contemporaneous legislation.[17] In 1982 — the year that the Constitution was put to the voters — the General Assembly enacted a new version of OCGA § 15-16-26, which then provided for the suspension of a sheriff by the Governor, upon the recommendation of a special committee (two sheriffs and the attorney general) for "criminal charges, alleged misconduct in office, or alleged incapacity of the sheriff to perform the functions of his office." Ga. L. 1982, p. 425, § 1. The General Assembly further provided that, if a sheriff were suspended, the Governor might "request the district attorney of the county of the sheriff's residence to bring a removal petition against the sheriff." Id. Moreover, the General Assembly provided that a "removal petition" was required to be filed if a sheriff were convicted of a felony. Id. Also in 1982, the General Assembly separately revised OCGA § 44-2-44, which provides that a clerk of the superior court is to be "removed from office" for certain fraudulent acts. Ga. L. 1982, p. 3, § 44.

In April 1984 — a little more than a year after the ratification of the Constitution of 1983 — the General Assembly enacted OCGA § 45-5-6, which made provision for the suspension and removal upon

---

[17] Perhaps not surprisingly, the drafting history of the Constitution of 1983 is ambiguous about the power to provide by general law for the removal of local constitutional officers, although some support can be found in that history for the notion that the drafters understood that the General Assembly would have such a power, notwithstanding that the Constitution said nothing about it explicitly. For instance, in the report of the Committee to Revise Article IX, the committee recommended the omission of a provision from the Constitution of 1976 that provided expressly for the removal of constitutional county officers upon conviction for malpractice in office, a recommendation that ultimately was incorporated into the original Constitution of 1983. In support of that recommendation, the committee explained that the removal from office of constitutional county officers was a "matter[ ] to be provided for by general law." Select Committee on Constitutional Revision, Legislative Overview Committee, Vol. I, Materials Considered at Meeting of June 30, 1981, Notes and Comments on Article IX, p. 1. Moreover, in a meeting of the Legislative Overview Committee, the same explanation was given for the omission of any provision for removal upon conviction for malpractice: "The four-year term requirement for these officers was retained, but the two-year residency requirement was omitted[,] as was the removal provision for conviction for malpractice in office, *which matters are to be provided for by general law.*" Select Committee on Constitutional Revision, Legislative Overview Committee, Vol. I, Transcript of Meeting of June 30, 1981, p. 7 (emphasis supplied). Although there are other portions of the drafting history that suggest other conclusions, the drafting history as a whole is ambiguous, and it certainly evinces no "clear and palpable" conflict with OCGA § 20-2-73.

felony indictment of not only two state constitutional officers as to whom the Constitution explicitly gave a power to provide for removal to the General Assembly (the Public Service Commission and district attorneys), but also "any elected county officer," "any member of a county, area, or independent board of education," and "any school superintendent of a county, area, or independent school system." Ga. L. 1984, p. 1279, § 1. As to these public officers, the General Assembly provided:

> Upon indictment for a felony by a grand jury of this state, which felony indictment relates to the performance or activities of the office of any public official, and in the case of a sheriff, any such indictment by this state or any such indictment by the United States, the Attorney General or district attorney shall transmit a certified copy of the indictment to the Governor who shall . . . appoint a review commission. Except as provided in this subsection, the commission shall be composed of the Attorney General and two public officials who hold the same office as the individual indicted. . . .
> Unless a longer period of time is granted by the Governor, the commission shall make a written report to the Governor within 14 days. If the commission determines that the indictment relates to and adversely affects the administration of the office of the indicted public official and that the rights and interests of the public are adversely affected thereby, the commission shall recommend that the public official be suspended from office. If, and only if, the commission recommends suspension, then the Governor shall review the findings and recommendations of the commission and may suspend the public officer from office immediately and without further action pending the final disposition of the case or until the expiration of his term of office, whichever occurs first. . . .
>
> . . .
>
> Upon the final conviction, the office of the public official shall be vacated immediately without further action. Said vacancy shall be filled in the manner provided by law for filling vacancies in such office.

Id. This nearly contemporaneous legislation suggests that the General Assembly understood its traditional authority to provide for the removal by general law of local constitutional officers was unchanged by the Constitution of 1983. Considering all these things, we cannot

say that the provisions of the Constitution of 1983 specifically authorizing the General Assembly to provide by general law for the removal of certain *state* constitutional officers "clear[ly] and palpabl[y]" conflict with the notion that the General Assembly may provide by general law without express constitutional authorization for the removal for cause of members of local boards of education.

(iii) Finally, Walker notes that the Constitution of 1983 specifically provides for the removal of members of local boards of education by recall, and that means of removal, he says, must be the only one the Constitution permits. Under our Constitution, the General Assembly is expressly "authorized to provide by general law for the recall of public officials who hold elective office." Ga. Const. of 1983, Art. II, Sec. II, Par. IV. This Court previously had recognized, however, that the power to authorize a recall of *local* constitutional officers was a part of the legislative power, even before express provision for recall was added to the Constitution, see *Smith*, 235 Ga. at 747, and within the plenary legislative power, it coexisted with the power to otherwise provide by general law for the removal of local constitutional officers for cause. Moreover, removal of a public officer by a recall election is of an inherently different character than removal at law, such as removal pursuant to OCGA § 20-2-73. Recall is not a means for the removal at law of public officers, but instead is a means for the *political* removal of such officers. See *Davis v. Shavers*, 269 Ga. 75, 76 (495 SE2d 23) (1998) ("[T]he recall procedure is not a 'judicial' or even 'official' procedure, but is political in nature, and the issue to be determined is of a political character." (Citation omitted)). See also *Collins v. Morris*, 263 Ga. 734, 735-736 (1) (438 SE2d 896) (1994) (distinguishing between recall, on the one hand, and impeachment, statutory suspension, and statutory removal, on the other); *Groditsky v. Pinckney*, 661 P2d 279, 282-283 (Col. 1983) (distinguishing between recall, which "may be used for a purely political reason," and impeachment and removal at law, which "contemplate removal from office for cause," and holding that "the power to remove public officials [at law]" and "the power of recall" are "cumulative and concurrent rather than exclusive remedies"). Given that every public officer must be amenable to the law, it would be odd to conclude that the Constitution renders certain public officers not amenable to removal at law by any means whatsoever.

We note as well that, with respect to local elected officers, recall is a means of removal committed to the voters of the local jurisdiction in which those officers were elected. But the qualifications of such officers and their good conduct in office — especially members of local boards of education — are manifestly of importance to the sovereign People of the State as a whole. After all, the Constitution expressly

provides for the General Assembly to establish "additional qualifications" for local boards by law, Ga. Const. of 1983, Art. VIII, Sec. V, Par. II, and it expressly states that "[t]he provision of an adequate public education for the citizens shall be a primary obligation of the *State of Georgia*," Art. VIII, Sec. I, Par. I (emphasis supplied). See also *Smith v. Bohler*, 72 Ga. 546, 552-553 (1884) ("Education is the cornerstone of a political fabric, especially where that fabric rests on the basis of popular suffrage." (punctuation omitted)). The public education of the children of DeKalb County may principally be a concern of the citizens of DeKalb County, but it also is an important concern of the People of Georgia as a whole. Again, it would be odd to conclude that the Constitution puts members of local boards of education entirely beyond the reach of the People as a whole. For these reasons, we cannot say that the recall provision of the Constitution of 1983 conflicts "clear[ly] and palpabl[y]" with the legislative power to provide by general law for the removal for cause of members of a local board of education.

(c) Finally, we consider whether OCGA § 20-2-73 is a proper exercise of the legislative power to provide by statute for the removal of members of a local board of education for cause, that is, for a failure to meet the qualifications of the office, for malfeasance in office, for misfeasance in office, or for nonfeasance in office. Walker says that it is not, inasmuch as it permits the removal of a board member not for any individualized wrongdoing, but for the fault of the board as a whole. We are unpersuaded. As we already have noted more than once, the General Assembly has determined that the one, "clearly essential" measure of the success of a board of education is "maintaining accreditation and the opportunities it allows the school system's students." OCGA § 20-2-49. When the conduct of a board threatens the school system with an imminent loss of its accreditation, it matters not to the public or the children of the school system whether it is the fault of a single board member, the fault of every board member, or the fault of no one in particular, just an unfortunate result of well-meaning individuals who cannot or do not work well together. The imminent loss of accreditation is a failure of the board as a whole all the same. As part of the same 2010 law that enacted OCGA § 20-2-73, the General Assembly also enacted OCGA § 20-2-61 (a), stating: "Local board of education members should work together with the entire local board of education and shall not have authority as independent elected officials but shall only be authorized to take official action as members of the board as a whole." See also *Akerman v. Bd. of School Commrs. of Cartersville*, 118 Ga. 334, 339-340 (45 SE 312) (1903) ("The board of school commissioners for the City of Cartersville is in no sense a purely private corporation, but a public

body, created for the purpose of exercising certain powers with a view to subserving the welfare of the inhabitants of that city, and, incidentally, that of the State at large. This end cannot be accomplished unless the members of the board work together, as harmoniously as may be, as it is unquestionably their legal duty to do."). In any event, upon a petition for reinstatement, a suspended member is entitled to individualized consideration, including, among other things, the extent to which that member contributed to the board governance-related issues that led to a threatened loss of accreditation, as well as the extent to which that member might contribute to a satisfactory resolution of the threatened loss. Whether it is characterized as setting a qualification for continued service on the local board of education in the extraordinary circumstance of an imminent loss of accreditation, or whether it is characterized as providing for removal for malfeasance, misfeasance, or nonfeasance in office, we are satisfied that OCGA § 20-2-73 is a permissible exercise of the legislative power to provide for the removal for cause of members of local boards of education.

2. We turn next to the contention that OCGA § 20-2-73 unconstitutionally delegates the power to suspend and remove the members of a local board of education to a private accrediting agency. Citing *Rogers v. Medical Assn. of Ga.*, 244 Ga. 151 (259 SE2d 85) (1979), Walker asserts that OCGA § 20-2-73 is unconstitutional because it delegates to SACS — a private accrediting agency that is not accountable to the voters — the authority to remove elected members of local boards of education. The *Rogers* opinion invalidated the statute that required the Governor to appoint members of the State Board of Medical Examiners from nominees made by the Medical Association of Georgia, a private organization. This Court held that while the General Assembly may, within constitutional limits, establish qualifications for public office and then designate a governmental appointing authority, it could not delegate the power to appoint to a private organization, noting that such an organization is not accountable to the people but to its membership. Id. at 153 (2). OCGA § 20-2-73, however, does not, in fact, delegate the power of suspension or removal to an accrediting agency. The placement of a school system on the level of accreditation that immediately precedes a loss of accreditation is merely the event that sets in motion the process for which the statute provides. The action of the accrediting agency triggers the required hearing by the State Board to determine whether to recommend that the Governor suspend all eligible mem-

bers with pay.[18] It is the Governor (an elected constitutional officer, accountable to the People as a whole), upon the recommendation of the State Board (a constitutional body), who makes the decision to suspend eligible members of the local board of education with pay "and, in consultation with the State Board of Education, appoint[s] temporary replacement members who shall be otherwise qualified to serve as members of such board." OCGA § 20-2-73 (a) (1). And it is the Governor who, if a suspended board member petitions for reinstatement, makes the decision, following a hearing conducted pursuant to the Georgia Administrative Procedure Act ("APA"), whether to reinstate or permanently remove a suspended member. On the face of the statute and the record in this case, we see no unconstitutional delegation of the power to suspend or remove members of local boards of education to a private accrediting agency.[19]

3. We next consider the contention that vesting the power of suspension and removal in the Governor — as OCGA § 20-2-73 does — violates the constitutional separation of powers, insofar as the Constitution commits the control and management of local school systems to local boards of education. The Constitution provides that "[t]he legislative, judicial, and executive powers shall forever remain separate and distinct," Ga. Const. of 1983, Art. I, Sec. II, Par. III, but this principle has no application to the questions presented in this case, considering that no one contends that OCGA § 20-2-73 vests *legislative* or *judicial* power in the Governor, an executive officer. Instead, Walker merely asserts that the Constitution provides for an elected local board to control and manage each local school system and that the General Assembly, by enacting the statute, violated this provision and effectively gave the power to control and manage local school systems to the chief executive of the State. In Division 1 (b) (i) of this opinion, we already have determined that the statute does not conflict with the constitutional commitment of the control and management of local school systems to local boards of education. As we held in Division 1, OCGA § 20-2-73 is an authorized exercise of the legislative power, and the Constitution confers upon the Governor the duty of faithfully executing the laws of the State. Ga. Const. of 1983, Art. V, Sec. II, Par. II. Moreover, as to the appointment of temporary

---

[18] As amended in 2013, OCGA § 20-2-73 (a) now requires the State Board to hold an open and public evidentiary hearing. Although not explicitly required at the time of the hearings in this case, the record reflects that the State Board made its hearings open to the public.

[19] We see no indication in the record of this case that the State Board or Governor has failed to exercise discretion under the statute and instead has deferred unreasonably to SACS. We will reserve judgment about whether such an occurrence would pose a constitutional problem.

replacement members of local boards of education, the Constitution expressly authorizes the Governor to "make such appointments as are authorized by this Constitution or by law," Ga. Const. of 1983, Art. V, Sec. II, Par. IX, and the Governor is charged with the filling of vacancies in public office "unless otherwise provided by this Constitution or by law." Ga. Const. of 1983, Art. V, Sec. II, Par. VIII (a). The executive branch of government is authorized to carry laws into effect, including laws that regulate official conduct. We see no violation of the separation of powers in the statute.

4. Last, we consider whether OCGA § 20-2-73 denies due process to suspended and removed board members. Walker contends that the procedures for suspension and removal do not afford due process, that the standard for reinstatement or removal is too vague to comport with due process, and that requiring a suspended member of a local board of education to apply for reinstatement to the Governor — who suspended the member in the first place — is a futile act. We will address these contentions in turn.

(a) About the adequacy of the procedural safeguards of the statute, we note to begin with that the District Court already has concluded that Walker has failed to demonstrate a substantial likelihood of success on his claim that the statute denies his right to due process under the United States Constitution, and as we have held before, the procedural rights afforded by the Due Process Clause of the Georgia Constitution in this context are the same as those afforded under the United States Constitution.[20] See *Joiner v. Glenn*, 288 Ga. 208, 209 (702 SE2d 194) (2010); *Camden County v. Haddock*, 271 Ga. 664, 665 (1) (523 SE2d 291) (1999). In this context, due process requires notice and an opportunity to be heard. Id. Both are afforded by OCGA § 20-2-73. At the initial suspension stage, the statute, as amended, requires the local school board itself to notify the State Board of the adverse action of an accrediting agency, after which the State Board conducts a hearing within a specified time, which may be continued at the discretion of the State Board upon a showing of good cause by the petition of a majority of members of the local board. OCGA § 20-2-73 (a). As amended, the hearing is required to be conducted as an open meeting at which testimony is required to be taken. Id. Even though these provisions were not expressly contained in the version of OCGA § 20-2-73 that was in effect at the time the hearing was conducted in this case, the record reflects

---

[20] "No person shall be deprived of life, liberty, or property except by due process of law." Ga. Const. of 1983, Art. I, Sec. I, Par. I. This Court has recognized that elected officials have a property right in their office that cannot be taken away without due process. See *Northway v. Allen*, 291 Ga. 227, 230 (728 SE2d 624) (2012).

adequate notice and an open hearing were provided to Walker and the other suspended members, and Walker cannot complain he was denied due process pursuant to the statute as it was applied to him. Moreover, it is reasonable for this initial suspension proceeding to be an expedited process due to the urgency of the threat of potential loss of accreditation. See *Daniel v. C&S Nat. Bank of Atlanta*, 182 Ga. 384, 396 (185 SE 696) (1936) ("The suspension of an officer pending his trial for misconduct, so far as to tie his hands for the time being, seems to be universally accepted as a fair, salutary, and often necessary incident to the situation."). Given the temporary nature of the initial suspension of the board member with pay, a lesser standard of procedural due process is permissible at this stage. See *Eaves v. Harris*, 258 Ga. 1, 4 (2) (b) (364 SE2d 854) (1988).

Before a member is removed permanently, however, the member is afforded the opportunity to petition for reinstatement, which triggers another hearing conducted after at least 30 days' notice to the member. OCGA § 20-2-73 (b) and (c).[21] This reinstatement hearing is an evidentiary hearing conducted by the Governor or his or her designated agent in accordance with the APA. OCGA § 20-2-73 (c). This means, among other things, the member is afforded the opportunity to be represented by counsel, to respond, and to present evidence on all issues involved. See OCGA § 50-13-13. As required by the APA, this hearing is a proceeding of record in which oral proceedings shall be transcribed, if requested, proposed findings may be filed, and findings of fact are required which shall be based exclusively upon the evidence and the matters officially noticed. Id. at (a) (8). The rules of evidence generally must be followed, and the member is afforded the opportunity to cross-examine witnesses. OCGA § 50-13-15. The final decision is subject to judicial review and appeal. OCGA §§ 50-13-19 and 50-13-20. As we noted in *Eaves*, 258 Ga. at 4 (2) (b), involving a proceeding for temporary suspension from office, the "amount of due process required depends upon the circumstances at hand." In this case, potentially involving a proceeding for permanent removal, the procedural due process afforded by the APA and OCGA § 20-2-73 is considerably more extensive than that provided in the *Eaves* case for temporary suspension and affords a full and fair evidentiary hearing in which the member is permitted to address the merits of the issue presented — whether the member's continued service on the board is more likely than not to improve the ability of the school system or school to retain its accreditation. Accordingly, we hold that OCGA § 20-2-73, both before and after the 2013 amend-

---

[21] These two subsections remain identical pre- and post-amendment.

ment, adequately protects the procedural due process rights of a member who is temporarily suspended and subject to permanent removal.[22]

(b) About the contention that the statutory standard for reinstatement is too vague to satisfy due process, Walker complains that whether reinstatement of a member is "more likely than not" to improve the prospect of the school system to retain its accreditation is purely speculative and requires the Governor to engage in conjecture about the potential action of a private accrediting agency. We are not persuaded, however, that the standard for reinstatement is unconstitutionally vague. We previously have considered an even less definite standard for removal from office — "malpractice in office," which, we said, meant "evil, bad or wrong practice in office" — and have held that it was not "too vague to be enforceable." *Beauchamp v. Smith*, 250 Ga. 16, 17-18 (3) (295 SE2d 97) (1982). At least on its face, the standard in this case is adequate. To the extent that Walker seeks to complain about the manner in which the standard has been applied, the lawsuit in which the District Court has certified this question to us is not an action for judicial review of a decision of the Governor to reinstate or remove a member of a local board of education. The judicial review afforded by OCGA § 20-2-73 (c) is the proper forum in which to raise questions about the application of the standard for reinstatement, and we reserve judgment about any application of that standard to members of the DeKalb Board. That said, we note that OCGA § 20-2-73 permits a suspended member petitioning for reinstatement to present evidence relevant to his or her role in the school board governance issues cited by the accrediting agency as grounds for placing the school system on the level of accreditation immediately preceding loss of accreditation. As a practical matter, in the event an accrediting agency takes action that triggers application of the statute, the notification of the change in accrediting status presumably should give at least some indication of the problems identified by the accrediting agency to which the members of the local board of education could respond.[23] The record

---

[22] Specific procedural issues that may arise when the statute is applied to temporary suspension proceedings in other cases or to permanent removal proceedings in this or other cases are not presented for decision at this time.

[23] As far as the possibility that an accrediting agency might threaten to withdraw accreditation based on arbitrary standards, OCGA § 20-2-73 (a) provides that the threatened or actual loss of accreditation must be "for school board governance related reasons," and that phrase reasonably can be understood to limit application of the statute to threatened or actual loss of accreditation based on rational standards. After all, an arbitrary action is one undertaken for no good reason at all, so an arbitrary threatened or actual loss of accreditation would not be one for any reason, including "for school board governance related reasons." And in any

in this case shows that SACS submitted a detailed report to the DeKalb Board, which identified the numerous board governance issues that the DeKalb Board needed to address to retain accreditation. Detailed examples were provided to illustrate the problems SACS identified in the report. In any given case, a suspended member petitioning for reinstatement may respond to the notification by the accrediting agency and present evidence that his or her continued service on the board would improve its ability to address the issues identified by the accrediting agency. Thus, we reject the contention that the statute on its face does not afford members of local boards of education a reasonable opportunity to understand the standard by which they will be judged so as to adequately prepare for the hearing.[24]

(c) Relying upon *WMM Properties, Inc. v. Cobb County*, 255 Ga. 436 (339 SE2d 252) (1986), Walker also contends that requiring a suspended member to convince the Governor — who suspended the member in the first place — that the member should be reinstated is to require a futile act and that the statute therefore violates due process. But in *WMM Properties*, we considered whether a property owner ought to be required to complain about the application of "severe zoning stipulations" to the very body that imposed those "severe zoning stipulations," and we held that "[r]equiring [the property owner] to seek a review that ultimately would result in a decision *on the same issue* by the same body would require a useless act." 255 Ga. at 440 (3) (emphasis supplied). In this case, however, the questions of suspension and reinstatement do not present "the same issue." In the first place, the "eligible members" of the local board of education are considered collectively with respect to suspension,

event, the State Board has discretion to recommend suspension or not, and in exercising that discretion, it presumably will consider whether the accreditation decision is out of step with public policy or otherwise is unreasonable. Cf. *Eaves*, 258 Ga. at 5 (2) (c) ("The Governor's discretion is limited by the requirement that a body composed of the public official's peers find his suspension warranted. Whatever 'unbridled' discretion exists may be exercised only in favor of the public official: should the commission recommend *against* suspension, the governor has no authority to override it." (Emphasis in original)). We do not foreclose the possibility that a suspension or removal following an arbitrary action by an accrediting agency might form the basis for a valid due process claim, but we see no such claim in this case.

[24] Contrary to Walker's argument, we do not understand the statute to require the Governor to hold the member up against her temporary, Governor-appointed replacement for purposes of reinstatement. Instead, the Governor must consider whether the member is more likely than not to contribute to a resolution of the "school board governance related" problems for which accreditation was threatened or withdrawn. Whether that consideration is to be given in the abstract or in comparison specifically to the temporary replacement appointed by the Governor is a question that we will leave to be addressed in any proceedings for judicial review of a decision to permanently remove a member. The case in which the District Court certified questions to us is not such a proceeding.

whereas the reinstatement decision is an individualized one. Moreover, the suspension question only concerns whether the members of the local board should be *temporarily* suspended with pay pending further proceedings, and that question is committed to the general discretion of the State Board and Governor. The reinstatement question, on the other hand, concerns *permanent* removal, and the statute provides a specific standard to be applied as to that question. Finally, the notion that the law does not require a useless act is not a due process doctrine but one by which a party is excused from exhausting administrative or other procedures that would, under the circumstances, be useless or futile before seeking judicial relief. For these reasons, we conclude that committing both questions — suspension and reinstatement — to the Governor does not require a suspended member to engage in a futile act by applying to the Governor for reinstatement.

5. Few things are more important than the education of our children. As the people of Georgia seek to improve Georgia's educational system, this Court must be mindful of the broad discretion granted by the Constitution to local school boards to manage and control local school systems. For all the reasons set forth herein, however, we conclude that OCGA § 20-2-73 is not an unconstitutional infringement upon the governing authority of local school boards, nor is it a violation of any other constitutional provision or right, as asserted by Walker in this case, and we answer the questions of the District Court in the negative.

*Certified questions answered. All the Justices concur, except Melton, J., who concurs in judgment only as to Division 4 (b).*

DECIDED NOVEMBER 25, 2013 —
RECONSIDERATION DENIED DECEMBER 11, 2013.

*Carlock, Copeland & Stair, Marquetta J. Bryan, Thomas A. Cox, Michael J. Walker,* for appellants.

*Samuel S. Olens, Attorney General, Dennis R. Dunn, Deputy Attorney General, Stefan E. Ritter, Senior Assistant Attorney General, Jennifer Colangelo, Assistant Attorney General,* for appellees.

*Harben, Hartley & Hawkins, Phillip L. Hartley,* amicus curiae.